**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHELLE ISAYEVA and KAHOLY FERNANDEZ, *on behalf of themselves, FLSA Collective Plaintiffs, and the Class,*<br><br>           Plaintiffs,<br>     v.<br><br>DIAMOND BRACES,<br>an unincorporated entity, association, or affiliation,<br>ORTHOCLUB, P.C.,<br>     d/b/a DIAMOND BRACES<br>JOHN DOE CORPORATIONS 1-100<br>     d/b/a DIAMOND BRACES, and<br>OLEG DRUT,<br><br>           Defendants. | Case No.: 22-cv-04575 |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION TO ENFORCE SETTLEMENT**

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs, FLSA Collective Plaintiffs
and the Class*

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................................... iii

**INTRODUCTION** ........................................................................................................................ 1

**ARGUMENT** ................................................................................................................................ 1

    I.    DEFENDANTS' FACTUAL CONTENTIONS ARE PROVABLY FALSE.................... 1

    II.   THE AGREEMENT SATISFIES THE *WINSTON* FACTORS ........................................ 5

        First Winston Factor – Reservation of Right Not to Be Bound ............................. 5

        Second Winston Factor – Partial Performance ....................................................... 6

        Third Winston Factor – Agreement on All Material Terms ................................... 8

        Fourth Winston Factor – Type of Agreement Committed to Writing .................. 9

    III.  DISCOVERY OF ATTORNEY-CLIENT COMMUNICATIONS IS WARRANTED .... 9

    IV.  IN THE ALTERNATIVE, THE COURT SHOULD ENFORCE A $900,000 SETTLEMENT ........................................................................................................... 10

# **TABLE OF AUTHORITIES**

**Cases**
*Case v. City of New York*,
   2012 U.S. Dist. LEXIS 169294, *18 (S.D.N.Y. 2012) ................................................................ 7

*Marett v. Metro Transp. Auth.*,
   2020 U.S. Dist. LEXIS 221867, *15-19 (S.D.N.Y. 2020) .......................................................... 5

*Wesley v. Corr. Officer Badge No. 9417*,
   2008 U.S. Dist. LEXIS 2, at *8 (S.D.N.Y. 2008) ...................................................................... 7

**INTRODUCTION**

Defendants' account of what transpired at the mediation is inconsistent with provable facts, which calls for the granting of the instant motion.

**ARGUMENT**

I. **DEFENDANTS' FACTUAL CONTENTIONS ARE PROVABLY FALSE**

Defendants maintain that they never agreed to the settlement, *see* **Exhibit A**, because their attorney at the time, Frank Giambalvo, left the mediation telling Plaintiffs' Counsel that he could not sign the class settlement because he had yet to confer with Defendants regarding its terms. However, Attorney Giambalvo's purported recollections cannot be credited when his characterization of what transpired at the mediation is provably false based on the documents submitted alongside Plaintiffs' motion. Attorney Giambalvo states the following in his sworn declaration.

> At the mediation, Mediator Martin F. Scheinman (the "Mediator") eventually informed the undersigned that Plaintiffs would agree to a class-wide settlement with a gross settlement fund of $1.5 million. As was commonplace in prior mediations between my clients and plaintiffs represented by C.K. Lee ("Lee") of Lee Litigation Group PLLC ("LLG"), LLG's associate attorney, Robert Kansao, Esq., under Lee's direction, started drafting a settlement term sheet (the "Term Sheet") for Defendants' review, as Defendants were considering the settlement proposal.

Declaration of Francis J. Giambalvo ("Giambalvo Decl.") ¶ 5

As Defendants present the situation, they were just the passive recipients of a settlement document that Plaintiffs' Counsel drafted to formalize what was merely a proposal supplied to Defendants via the mediator at the close of the mediation. But the email record clearly shows that Plaintiffs' Counsel Robert Kansao began drafting the settlement document well before the $1.5 million settlement sum was ever broached. As detailed and documented in Plaintiffs' memorandum-in-chief, early on in the mediation, the parties agreed that all ancillary settlement

1

terms would be modeled on those agreed upon by Plaintiffs' Counsel and Attorney Giambalvo in another, previously settled, case. Attorney Kansao initially drafted the settlement document to formalize *this* point of agreement, not the $1.5 million settlement sum, as Attorney Giambalvo now claims. That sum was agreed upon only later in the mediation, at which point Attorney Kansao proceeded to insert the sum in the previously drafted document. Attorney Giambalvo did *not* then depart the mediation with the document in hand in order to later discuss it with Defendants. On the contrary, he responded to the document by requesting a change on behalf of Defendants, asking that the class release period extend up through 90 days after the date of the agreement, to give Defendants' time to cure the alleged wage violations. Attorney Kansao then incorporated this change into the document and emailed it back to Attorney Giambalvo and Defendants.

Defendants were therefore involved in the mediation and read the settlement agreement while it was ongoing, as they could not otherwise have known that they wanted the scope of the release changed. Defendants did *not*, however, respond with any requested changes to the settlement sum itself, and this is because that sum had been agreed upon before Attorney Kansao sent Attorney Giambalvo the penultimate draft of the settlement agreement. One would not normally take up a relatively ancillary issue like the precise scope of the release before first agreeing upon the more basic issue of what the settlement sum is to be, because absent agreement on this vital point there will not be a release of any kind.

Attorney Giambalvo's purported recollection of events is furthermore inconsistent with the protocols that had been set forth by Mediator Martin F. Scheinmen. As Plaintiffs' Counsel C.K. Lee explains in his Declaration:

> At all mediations with Martin Scheinman, if there was no settlement, then the parties would break without any agreement of terms distributed. However, if there was a settlement, Mr. Scheinman would insist that an agreement be distributed that same day and that the parties would discuss any disagreement with the distributed

2

>agreement. That occurred in this case, so I know with absolute certainty that the parties came to an agreement on the class settlement terms.

Declaration of C.K. Lee ("Lee Decl.") ¶ 6

While Attorney Giambalvo denies that he told Plaintiffs' Counsel that he would sign the settlement agreement the day following the mediation, he does not dispute the foregoing characterization of Mediator Scheinman's mediation protocols. Those protocols contradict Defendants' contention that they were merely the passive recipients of a settlement proposal conveyed through a term sheet, as Mediator Scheinman would not have permitted the inclusion of the $1.5 million settlement sum in a settlement document had this most basic of terms not been agreed upon in advance. Mediator Scheinman was also copied on all correspondence and did not ever suggest that the settlement amount was in any way incorrect. Nor did Defendants ever suggest this to Mediator Scheinman.

Attorney Giambalvo maintains that he could not have committed to signing the settlement agreement the following day because he "needed time to review and explain its contents to Defendants, who were still considering whether to agree to a settlement at all." Giambalvo Decl. ¶ 7. However, Defendants were active participants in the mediation, so they did not require any further special conversation with Attorney Giambalvo for the settlement terms to be "explained" to them—as shown by the fact that Defendants requested a change to the scope of the release *at the mediation itself*. The entire point of mediation is to conclude a settlement that day through the assistance of the mediator. The point is *not* for attorneys to brainstorm ideas between themselves so that they may later bring the resulting proposals to the attention of erstwhile uninvolved clients. Attorney Giambalvo's characterization of events is inconsistent not only with provable facts regarding what rook place at the mediation but also with what everyone understands a mediation to be. Attorney Giambalvo "unequivocally den[ies]" that he "agreed to settle a matter without a

3

client's authorization." Giambalvo Decl. ¶ 8. But Plaintiffs have never alleged that he did so. Defendants were present at the mediation and authorized him to accept the $1.5 million settlement sum, just as they authorized him to insist that the scope of the release be extended to "90 days after the date of this Agreement." *See* **Exhibit C-1, C-2**.

Defendants do not so much as address the significant probative value of Plaintiffs' Counsel Lee's December 9, 2022, email communications with Mediator Scheinman, where Attorney Lee complained to Mediator Scheinman that "the parties had agreed to the terms at the mediation" and that "they said they would sign the term sheet the next day; instead they have caused further delay." Lee Decl., **Exhibit E**. This proves the credibility of Plaintiffs' Counsel, who are arguing the same thing today as they were on December 9, 2022. That credibility is further confirmed by Mediator Scheinman's response to Plaintiffs' Counsel's request that Scheinman speak directly with Attorney Giambalvo in order to secure the promised signature on the settlement agreement. Notably, Scheinman does not dispute Plaintiffs' Counsel's basic characterization of the mediation and its results. He does not deny that an agreement was reached or that Attorney Giambalvo promised to execute that agreement the day following the mediation. Instead, Scheinman responds that he intends to contact Attorney Giambalvo to address the problem. This response would make no sense had the basic premises of Plaintiffs' Counsel's complaint been erroneous. Mr. Scheinman would not have been prepared to call Mr. Giambalvo to inquire into his delay in executing the agreement if Mr. Scheinman believed that no agreement had ever been reached in the first place.

Defendants also fail to refute the fact that events subsequent to the mediation confirm that an agreement had been reached there. On December 12, 2022, Attorney Giambalvo emailed Plaintiffs' Counsel to ask about the formula for allocating the settlement sum between individual class members. As with their concern regarding the scope of the release, Defendants would not

4

have inquired into the relatively ancillary issue of how the settlement sum was to be allocated had the more basic issue of the settlement sum itself not already been determined. Defendants maintain that Attorney Giambalvo's subsequent concern with instituting a settlement "cap" of under $900,000 is evidence that no agreement was reached at the mediation. In fact, it was evidence that Defendants were attempting to renegotiate what they knew to be an agreed-upon material term, under the guise of addressing a merely ancillary issue. *See* **Exhibit D** at 6.

## II.     THE AGREEMENT SATISFIES THE *WINSTON* FACTORS

*First Winston Factor – Reservation of Right Not to Be Bound*

Defendants argue that they reserved the right not to be bound by the settlement agreement by drawing analogies with *Marett v. Metro Transp. Auth.*, where the court "ruled that the language of the parties' e-mail communications 'used in and shortly after the purported agreement indicates an intent not to be bound' until a more formal written agreement was executed." Def. Opp. at 11 (quoting 2020 U.S. Dist. LEXIS 221867, *15-19 (S.D.N.Y. 2020)). Yet Defendants ignore fundamental dissimilarities between the two cases. In *Marett*, there was no suggestion that the parties might have reached an agreement through any kind of direct, one-on-one communication, as is the case in this action. Magistrate Judge Lehrberger did preside over a settlement conference, but no agreement was reached there. After the failed conference, Judge Lehrberger engaged in separate correspondences with the parties until the defendants "offered to take specific remedial actions regarding training and communication between AAR drivers and visually impaired customers." *Id*. at 4-5. Judge Lehrberger then conveyed the proposal to plaintiffs' counsel, who responded by providing "an unsigned but full-fledged agreement titled 'Confidential Settlement Agreement and Release of Claims,'" instructing Judge Lehrberger to recommend that defendants execute it "[i]f this Agreement comports with the terms for settlement as proposed by Defendants."

5

*Id*. at *7. Judge Lehrberger forwarded this document to the defendants, who responded directly to plaintiffs that they "hope to have a counterproposal to you within the next few days" and, a week later, sent plaintiffs' counsel a "revised draft." *Id*. at 8. Plaintiffs then rejected this proposal, and Judge Lehrberger ruled that no agreement had ever been reached given that plaintiff's counsel had "expressed uncertainty as to whether the written agreement comported with the terms of settlement as proposed by Defendants," which "indicate[d] uncertainty as to whether the parties had a meeting of the minds." *Id.* at *17.

The facts at hand could not be more different. Unlike in *Marett*, the agreement here was reached through direct one-on-one communication at the mediation itself, not just attempted through subsequent email correspondences. Subsequent communications are probative of the parties' agreement, but Plaintiffs do not argue that these communications *created* the agreement. Also unlike in *Marett*, the party seeking to enforce the alleged agreement never responded to the other side's proposal with a "counterproposal" and "revised draft." The only revised draft was the one Plaintiffs created at Defendants' behest, when Defendants requested that the scope of the release be expanded without expressing any concerns about the settlement sum.

### *Second Winston Factor – Partial Performance*

Defendants argue that there was no partial performance on the settlement agreement because "no parties 'stood down' on litigating the claims in the year and a half since the mediation." Def. Opp. at 12.  However, what matters for purposes of the second *Winston* factor is not "the year and a half since the mediation" but the time period between the mediation and the date when it became evident that Defendants were attempting to back out of the agreement. *Obviously*, Plaintiffs were not going to unilaterally and self-defeatingly desist from litigation once this became clear. What matters is that they desisted from litigation *until that point*, because it is

the parties' conduct during this period that promises to reveal something about the parties' understandings at the mediation.

In a similar vein, Defendants argue that Plaintiffs' position is undercut by the fact that they "did not (i) confirm assent to the Term Sheet, (ii) email Giambalvo that he promised to execute the Term sheet the day after the mediation, (iii) demand payments of $75,000 per month starting on January 15, 2023 through final approval of the settlement (which were never issued), (iv) notify the court that a settlement was reached (until they sought to file a motion to enforce after negotiations failed), or (v) file a motion for approval of a class-wide settlement." Def. Opp. at 14. But there was no good reason for Plaintiffs' Counsel to undertake (i) and (ii) given that Plaintiffs' Counsel had already confirmed their assent to the settlement at the mediation and that Attorney Giambalvo was perfectly aware of what he himself had promised. There was no good reason for Plaintiffs' Counsel to undertake (iii), (iv), and (v), as these steps would have been futile given Defendants' uncooperativeness—absent judicial enforcement of the agreement, which is precisely what Plaintiffs now seek through the instant motion.

Plaintiffs cited two cases for the proposition that Plaintiffs' distribution of the agreement in and of itself constitutes partial performance on the agreement. *See Wesley v. Corr. Officer Badge No. 9417*, 2008 U.S. Dist. LEXIS 2, at *8 (S.D.N.Y. 2008); *Case v. City of New York*, 2012 U.S. Dist. LEXIS 169294, *18 (S.D.N.Y. 2012). Defendants dismiss these cases as inapposite. *See* Def. Mem. at 16. But these facts are highly analogous to those set forth here. Since the parties here were negotiating class claims, effectuating the settlement was obviously going to require more than the issuance of a single lump sum settlement check required in the cited cases. But this difference in remedies is immaterial to whether an agreement was reached. On this point, Plaintiffs' citations fully support their position.

7

*Third Winston Factor – Agreement on All Material Terms*

Defendants strangely argue that Plaintiffs have failed to satisfy the third *Winston* factor because "no documents memorializing a final agreement on all material terms were ever finalized and executed." Def. Opp. at 3. It is true, of course, that the agreement was never executed, given Defendants' decision to back out of it. But the agreement was most certainly *finalized*. At no point do Defendants dispute that the contents of the agreement emailed to them were sufficiently definite to be enforceable as a contract had the agreement been signed. That is all that matters for purposes of the third *Winston* factor. The fact that the agreement was unexecuted is completely irrelevant to the *Winston* analysis, as the entire purpose of that analysis is to determine whether a binding agreement was formed *notwithstanding the lack of signatures*.

Defendants fail in their attempt to argue that subsequent email communication reveal a lack of agreement on material terms. Defendants cite the fact that, on December 14, 2022, Plaintiffs' Counsel "requested a call [with Attorney Giambalvo] to 'resolve any issues and get a status' as to finalizing the settlement." Def. Opp. at 19. However, "finalizing" is merely Defendants' characterization and not a term that actually appears in Plaintiffs' Counsel's email. *See* **Exhibit D** at 3. That Plaintiffs' Counsel hoped to "resolve any issues" hardly indicates that no agreement was reached at the mediation. Attorney Giambalvo had not yet executed his agreement, despite his promise to do so at the end of the mediation, so Plaintiffs' Counsel rightly discerned that there were "issues" of some kind that needed to be addressed. The fundamental "issue" was Attorney Giambalvo failure to execute the agreement, not any material terms therein. Plaintiffs' Counsel's wish to "get a status" implies that Plaintiffs' Counsel was *waiting* on Attorney Giambalvo to *complete* something, the execution of the agreement, and therefore does not suggest that material terms were still being negotiated.

*Fourth Winston Factor – Type of Agreement Committed to Writing*

The fourth *Winston* factor concerns whether the purported agreement at issue is the kind that is ordinarily put to writing, and Plaintiffs have argued that the agreement was in fact put to writing with the completeness that is normally expected of class settlement agreements. This is not a case, like *Marett*, where the final terms of a purported settlement agreement must be inferred from the parties' back-and-forth emails, where there might exist ambiguity as to what had actually been agreed upon and what was merely being considered or accepted only tentatively. The fact that the agreement went unexecuted is irrelevant, as the purpose of the *Winston* analysis is to resolve just such situations. Against this, Defendants argue that the agreement was not in writing to the degree necessary because FLSA and NYLL class settlements agreements must be "submitted to the Court for a multi-step approval process." Def. Opp. at 2-3. However, tis irrelevant to the question of whether the agreement is *enforceable between the parties*, which is all the *Winston* analysis addresses. On Defendants' argument, any party would be entitled to unilaterally void a class settlement agreement at any point prior to the completion of the settlement approval process, an absurd conclusion for which Defendants provide no legal support.

### III. DISCOVERY OF ATTORNEY-CLIENT COMMUNICATIONS IS WARRANTED

Defendants' only response to Plaintiffs' extensive argument that an inquiry into Defendants' communications with Mr. Giambalvo is appropriate is: "Despite Plaintiffs' contentions, discovery is not necessary. In fact, Plaintiffs do not provide any evidence or other indicia that Giambalvo's statements were not authorized by Defendants, were a fabrication or otherwise ran counter to Defendants wishes." Def. Opp. at 23. Plaintiffs have never claimed that Attorney Giambalvo ignored his clients' wishes. To the contrary, Plaintiffs argue that his clients' wishes were first to conclude a settlement agreement and then to back out of that agreement. To

9

the extent the Court feels that further discovery is warranted to ascertain Defendants' and their counsel's intent during and after the mediation, production of their email and text correspondences would help the court adjudicate this matter. It is telling that Defendants have not voluntarily produced any such correspondences to reveal their state of mind and refute Plaintiffs' position, and furthermore failed to have the associate Richard Sui corroborate their position, despite stating that he was witness to the mediation proceedings. *See* Giambalvo Decl. ¶ 8.

### IV. IN THE ALTERNATIVE, THE COURT SHOULD ENFORCE A $900,000 SETTLEMENT

Defendants argue that they could not have agreed to a $900,000 settlement because (1) "after this office was substituted as Defendants' counsel, LLG contacted this office to express a willingness to settle the case at the $900,000 capped amount" and (2) Defendants did not respond to this overture. Def. Mem. at 24. However, any such later communications are irrelevant to whether Defendants agreed to at least $900,000 *on December 9, 2022*, when they first set forth that number. Defendants' subsequent decision to renege on this sum as well has no bearing on whether an agreement was formed in the first place.

Dated: May 24, 2024

                                                                Respectfully submitted,

By:    */s/ C.K. Lee*
           C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs,*
*FLSA Collective Plaintiffs,*
*and the Class*